**Ratna MATURU, Petitioner,**

v.

**DISTRICT OF COLUMBIA DEPARTMENT OF EMPLOYMENT SERVICES, Respondent.**

No. 97–AA–446.

District of Columbia Court of Appeals.

Submitted Dec. 9, 1998.

Decided Jan. 7, 1999.

Ratna Maturu, pro se, was on the brief for petitioner.

Sharman J. Monroe, Washington, DC, was on the brief for respondent.

Before STEADMAN and REID, Associate Judges, and BELSON, Senior Judge.

STEADMAN, Associate Judge:

The issue in this appeal is the proper treatment of severance pay in determining the eligibility of a laid-off employee for unemployment benefits. The Department of Employment Services (DOES) apparently interpreted our decision in *Dyer v. District of Columbia Unemployment Comp. Bd.*, 392 A.2d 1 (D.C.1978), to mandate that a severance payment must be treated as applicable to the time in which the payment was actually made to the employee. We think this is an incorrect reading of that case and therefore vacate the DOES order denying unemployment benefits to petitioner and remand for further proceedings.

## I.

As a result of downsizing efforts by her employer, Blue Cross Blue Shield of the National Capitol Area, petitioner Ratna Maturu was informed in a letter dated January 21, 1994, that she was being discharged as of that date. However, the letter said, the employer was making a voluntary offer of the following "severance pay and health insurance coverage" arrangement:

> Eight (8) weeks severance at your current salary, less standard withholding and authorized deductions paid over eight (8) weeks in bi-weekly installments, and group health insurance coverage during this period. Outplacement services will be provided to you in accordance with the reduction in force policy.

The letter went on to state that if the offer was accepted, "in your final paycheck you will receive payments for your accrued annual leave in accordance with company policy, and at the end of your severance period you will have the opportunity to continue your health insurance under the terms of COBRA." In consideration of the severance pay and health insurance coverage, Maturu was required to waive all claims that she might have against the employer, including but not limited to those arising under the Age Discrimination in Employment Act (ADEA). As required by the ADEA when such waivers are included, 29 U.S.C. § 626(f)(1), the offer was to remain open for forty-five days and even if accepted and signed could be revoked by Maturu within seven days thereafter. The letter advised Maturu to consult counsel prior to signing the agreement. If the offer was not accepted, the final paycheck would still include accrued annual leave but rather than group insurance, "you will have the opportunity to continue your health insurance under the terms of COBRA at that time."

Because she "wanted to be sure I understood the language," Maturu did not sign the agreement until February 28, 1994. Biweekly severance payments were then made over the ensuing eight weeks. Because it was her understanding that the eight-week period to which the severance pay was attributable began on January 21, the date of her termination, she did not apply for unemployment compensation until March 15. She obtained new employment effective April 25, 1994.

The issue, then, was whether she was entitled to unemployment benefits for the period March 13, 1994, to April 23, 1994.[1] After a hearing, the appeals examiner ruled as follows. Severance pay constitutes "earnings" for unemployment eligibility purposes. Since Maturu was not entitled to any severance payments until she signed the agreement on February 28, and was "thus to be paid severance in regular biweekly payments for eight weeks,"[2] she was ineligible to receive unemployment benefits for the period in question.[3] "Only when the claimant does not received [sic] severance is she eligible for unemployment benefits." The Acting Chief of the Office of Appeals and Review in a summary opinion found "no reason to disturb the decision of the Appeals Examiner." Maturu timely sought review by this court.

## II.

For unemployment insurance purposes, "earnings" are defined as "all remuneration payable for personal services, including wages, commissions, and bonuses." Further, "an individual shall be deemed 'unemployed' with respect to any week during which he performs no service and with respect to which no earnings are payable to him." D.C.Code § 46–101(4), (5).

In *Dyer v. District of Columbia Unemployment Comp. Bd., supra,* a dismissed employee had been given "two months' volun-

---

1. These are the dates addressed by the appeals examiner. Maturu indicates, however, that she did not expect benefits to be paid prior to March 18 at the earliest, which was eight weeks from the date of her last day of employment.

2. This statement is followed by the phrase "ending the week ending 3/23/94." Presumably the appeals examiner meant the date of 4/23/94,

which was eight weeks after the date that Maturu signed the agreement. March 23, 1994 was a Wednesday.

3. It was undisputed that the severance pay exceeded the maximum weekly benefit amount for which Maturu qualified as determined by D.C.Code § 46–108(e).

tary dismissal pay" by her employer. We affirmed a DOES ruling that the employee was ineligible for unemployment insurance for the first five weeks following her dismissal because it had been based on misconduct, as then provided in D.C.Code § 46–310(b) (1973), and for the next four weeks thereafter because of her voluntary dismissal pay. Apparently the full two months dismissal pay was given the employee at the time of her dismissal. We noted that prior to 1972, the law expressly excluded from the definition of wages "dismissal payments ... which the employer is not legally required to make," D.C.Code § 46–301(c)(3) (1968), and held that the deliberate omission of that language in the 1972 amendments brought such payments within the definition of "earnings." [4] *Dyer, supra*, 392 A.2d at 3. Accordingly, we said, "an individual is not unemployed for a given pay period if he receives voluntary dismissal payments for that period," and the examiner was correct in finding that "petitioner was ineligible for compensation during the additional four-week period for which petitioner received voluntary dismissal payments." *Id.*

There is a clear distinction, however, between the time period *for which* an employee receives voluntary dismissal payments (that is, the time period with respect to which they are *attributable* ) and, on the other hand, the time period during which those payments are actually *made* to the employee.[5] The definition of "unemployed" speaks of a week "with respect to which no earnings are payable" to the employee. D.C.Code § 46–101(5). In *Dyer,* we spoke of the ineligibility of an employee during a pay period where he receives severance payments "for that period,"

regardless of when the payment is actually made to him, and said that the petitioner in that case was ineligible for unemployment benefits during the four-week period "for which" she received the dismissal payments. *Dyer, supra,* 392 A.2d at 3. As already indicated, it appears that in fact the payment was made to the petitioner in a lump sum upon departure. Nonetheless, rather than hold ineligibility to the single week in which the payment was made, the money was attributed forward for the two months we assumed it was intended to cover. *Dyer* does not hold that the time the severance payments were actually made to the employee is controlling, contrary to what the appeals examiner may have thought in the case before us.

An issue then arises about the intent of the parties with respect to the time period for which the severance pay was received (that is, was to be attributable). The agreement itself is silent on the point. There was no square finding on this issue by the appeals examiner. Maturu testified that she thought the eight-week period commenced on the date of her discharge, an expectation that may well be in accord with the normal understanding of severance pay.[6] Moreover, the agreement itself intertwines the period of severance pay with that of an extension of group health insurance coverage for the same period, with rights under COBRA to accrue thereafter. It would seem unlikely that the parties contemplated that Maturu would be left uncovered by any health insurance, group or COBRA, during the period between the discharge and the signing of the agreement.[7]

---

**4.** The petitioner in *Dyer* argued that the payment was a "gift"-and not a voluntary dismissal payment, an argument we rejected without comment.

**5.** Many employees are familiar with a compensation procedure whereby they receive paychecks at a time significantly separated from the period when the work was actually performed.

**6.** WEBSTER'S Third New International DICTIONARY (Unabridged 1971) defines severance pay as "an allowance usu. based on length of service that is payable to an employee *upon separation* except usu. in case of disciplinary discharge" (emphasis added).

**7.** To the extent that minimizing the need for unemployment benefits is a relevant consideration, that aim of the employer and DOES would appear to be best-served by ascribing severance

The employer's representative at the hearing, who was not the signatory of the January 21 letter, said that the offer of severance was "just good faith gesture on our behalf to, you know, tie some of the people over until they could find employment." The representative also testified that it was made clear that Maturu would not be eligible for severance payments nor would they begin until she signed the agreement, but did not specifically address the time period to which the payments were thought to be attributable.

Given the possible misinterpretation of our *Dyer* holding and the absence of a potentially significant factual finding on the parties' intent, we are constrained to vacate the DOES decision and to remand the case for further proceedings not inconsistent with this opinion.

*So ordered.*

---

benefits to the period immediately following discharge of an employee, at least if such employees are well-advised of their rights. Unless otherwise agreed, severance is presumably payable even if a discharged employee promptly obtains other work. *See, e.g., Adams v. Jersey Central Power and Light Co.,* 21 N.J. 8, 120 A.2d 737,

740–41 (N.J.1956). For example, under DOES's interpretation, Maturu could have received unemployment benefits for the first five weeks after her discharge, whereupon severance payments would commence and continue even if she obtained a new position, say, on the fiftieth day after her discharge.