*Notice: This opinion is subject to formal revision before publication in the Atlantic and Maryland Reporters. Users are requested to notify the Clerk of the Court of any formal errors so that corrections may be made before the bound volumes go to press.*

# DISTRICT OF COLUMBIA COURT OF APPEALS

No. 24-AA-0010

LIN LUO, PETITIONER,

V.

DISTRICT OF COLUMBIA
DEPARTMENT OF EMPLOYMENT SERVICES, *et al.*, RESPONDENTS.

On Petition for Review of an Order
of the District of Columbia Office of Administrative Hearings
(2023-DOES-00546)

(Submitted October 22, 2024                    Decided February 27, 2025)

*Lin Luo*, pro se.

*Brian L. Schwalb*, Attorney General for the District of Columbia, *Caroline S. Van Zile*, Solicitor General, *Ashwin P. Phatak*, Principal Deputy Solicitor General, and *Thais-Lyn Trayer*, Deputy Solicitor General, filed a statement in lieu of brief for respondent District of Columbia Department of Employment Services.

*John M. Remy* and *Desireé H. Langley* were on the brief for respondent American Chemical Society.

Before MCLEESE and HOWARD, *Associate Judges*, and THOMPSON, *Senior Judge.*

THOMPSON, *Senior Judge*: Pro se petitioner Lin Luo seeks review of a final order of the Office of Administrative Hearings ("OAH") that determined her ineligible for unemployment benefits for the period from April 5, 2023 to June 28,

2023, and also of OAH's subsequent order denying her request for reconsideration.[1] OAH reached its ineligibility determination on the ground that petitioner received post-job-termination separation payments that the OAH administrative law judge ("ALJ") determined must be treated as severance-pay earnings. Petitioner contends that the ALJ's conclusion was in error because the payments were settlement payments rather than severance pay—a characterization that would have been supported, petitioner asserts, by parol evidence that the ALJ declined to consider. For the reasons that follow, we vacate the OAH orders and remand for further proceedings.

## I.     Factual and Procedural Background

Beginning on September 24, 2018, petitioner worked for respondent American Chemical Society ("ACS") as an accountant. She was notified on April 4, 2023, that that would be her last day of employment. She and ACS entered into an Agreement and General Release (referred to hereafter as the "Agreement") that provides for her personnel records with ACS to "reflect the reason for separation as 'Job Elimination.'" The Agreement was prepared by ACS and signed by petitioner and by ACS's Executive Vice President for Human Resources.

---

[1] OAH deemed petitioner's "Request to Change the Final Order" a motion for reconsideration under OAH Rules 2828.3 through 2828.5.

Section 2 of the Agreement states that ACS would pay petitioner specified benefits "[i]n consideration for [her] signing th[e] Agreement . . . , including severance pay." The total gross payments to be made, referred to in the Agreement as "Separation Pay," totaled $19,603.98. That amount was calculated as "the equivalent of two weeks of [petitioner's] standard weekly salary for every full year of [petitioner's] service as a full-time employee of [Employer], plus an additional four weeks' salary which ACS [paid] in lieu of advance notice of [petitioner's] separation, totaling 12 weeks' pay . . . at [petitioner's] current rate of compensation." It was to be paid in equal installments throughout a twelve-week period, starting "within forty-five days after the Separation Date, or the next regular ACS payroll date after the expiration of the seven-day revocation period . . . continu[ing] through ACS's normal payroll practice and according to its regular payroll schedule." Petitioner "negotiated the payment as biweekly," rather than a lump sum, to address her concerns over the tax-withholding treatment of a lump sum payment.

In signing the Agreement, petitioner "acknowledge[d] and affirm[ed]" that she had "no knowledge of any existing violations or suspected violations by ACS of . . . any . . . federal, state, or local laws," that she had "not reported internally to ACS any allegations of wrongdoing by ACS or its officers," and that she had "not been retaliated against for reporting any such allegations internally to ACS."

Neither the Agreement nor its consideration was to be "deemed or construed at any time for any purpose as an admission by Releasees of wrongdoing or evidence of any liability or unlawful conduct of any kind." Further, the Agreement states that it "sets forth the entire agreement between the Parties" and that petitioner "has not relied on any representations, promises, or agreements of any kind made to [her] in connection with [her] decision to accept th[e] Agreement, except for those set forth in th[e] Agreement." It also provides that "parol evidence shall not be admissible to alter, vary, or supplement the term of this Agreement."[2]

Shortly after the Agreement was fully executed, petitioner applied for unemployment benefits. ACS informed the Department of Employment Services ("DOES") in response to the agency's inquiry that petitioner's separation payment was to cover the period from April 28, 2023, to July 7, 2023. A DOES claims examiner determined (for reasons that need not concern us here) that petitioner was ineligible for unemployment benefits for a slightly different date range (the April 30, 2023, to July 8, 2023, period). Petitioner appealed to OAH from that determination.

---

[2] Petitioner has not suggested that the quoted language—specifically, the singular "*term* of this Agreement" (italics added)—should be construed to mean that it is only the time period of the Agreement (rather than all of its terms) that may not be altered or varied based on parol evidence.

An OAH ALJ presided over an evidentiary hearing via WebEx on May 31, 2023. The ALJ heard testimony from petitioner and a DOES examiner; ACS did not participate in the hearing. During the hearing, petitioner sought to introduce into evidence what she referred to as over 200 pages of documents by which she complained to ACS about sexual harassment and retaliation by one of her superiors. The ALJ did not admit the documents because they were late-submitted and because, the ALJ stated, they were "inadmissible parol evidence."

In its Final Order issued after the hearing, the OAH ALJ, although slightly modifying the claims examiner's determination as to dates, held that the payments constituted severance pay and that petitioner was therefore ineligible for unemployment benefits for the April 5 to June 28, 2023, period. The ALJ relied on several factors to find that the Agreement provided for severance payments (which, under the language of DOES regulations, are earnings that reduce or negate a claimant's entitlement to unemployment benefits for the relevant week)[3] rather

---

[3] *See* 7 D.C.M.R. § 321.11 ("Severance pay constitutes earnings[.]"); D.C. Code § 51-107(e) (providing for payment of weekly unemployment benefits in "an amount equal to the individual's weekly benefit amount less any earnings payable to the individual with respect to such week").

than payments in settlement of claims of injury (which—the ALJ reasoned and DOES appears to agree—would not necessarily have that effect[4]).

Relying on this court's decisions in *Maturu v. D.C. Dep't Emp. Servs.*, 722 A.2d 846, 848 (D.C. 1999), and *Gardner v. D.C. Dep't of Emp. Servs.*, 736 A.2d 1012, 1015-17 (D.C. 1999), the ALJ reasoned as follows:

> Earnings from severance are attributable to the time period that the parties intend the payments to cover, regardless of when the severance is paid. In each case, DOES — and therefore, an administrative law judge on appeal — must follow "the intent of the parties with respect to the time period for which the severance pay was received (that is, was to be attributable)."
>
> It logically follows that, if the parties['] intent governs the allocation of severance payments, then their intent also governs the nature of post-employment payments. Therefore, if the parties intended the payments to reimburse or replace a loss Employer caused Claimant to incur by a past injury or damage, then the payments were not severance.

Although, during the hearing, the ALJ acknowledged that the parties' "[c]alling [the Separation Pay] severance pay doesn't make it severance pay[,]" he concluded in the Final Order that the plain language of the Agreement unambiguously reflected the parties' intent that the Separation Pay constitute severance pay for the period from April 5 to June 28, 2023. The ALJ noted that the Agreement calls the

---

[4] See the discussion *infra.*

payments "severance" in two places[5] and expressly based the payment amount on petitioner's years of service and lack of advanced notice of her separation, consistent with "a traditional severance." The ALJ reasoned:

> [T]hese facts show that the parties' mutual intent as evidenced by the clear and definite words in their written agreement was that the payments were made not as a settlement of an existing claim or any other reason other than a traditional severance as defined by the applicable regulation. . . .
>
> And contrary to Claimant's assertions during the hearing, the agreement's clear and definite language shows that the payments were not reimbursement for any claim Claimant had against Employer for sex discrimination or sexual harassment. First, Claimant, by signing the agreement, agreed that she had "no knowledge of any existing violations or suspected violations by [Employer of any] federal, state, or local laws," which necessarily included any claim for sex discrimination or sexual harassment. If she agreed that she knew of none, the agreement could not be a settlement for such a claim.
>
> She also agreed that she had "not reported internally to [Employer] any allegations of wrongdoing by [Employer] or its officers [and that Claimant had] not been retaliated against for reporting any such allegations internally to" Employer, so Employer could not be settling a claim that Claimant agreed that she never

---

[5] *See* Section 2 ("ACS agrees to provide Employee the following benefits, including severance pay") and Section 7(a) ("Employee agrees not to publicize . . . the amount paid as severance"). We note that the Agreement does not say that *all* of the payments made pursuant to it would be severance payments.

reported. *Id*. (¶ 6(e)).39 Therefore, under the agreement, the payments made were intended to be severance.

The ALJ found that petitioner signed the Agreement "without fraud, duress, or mutual mistake" and with understanding of the Agreement's terms. The ALJ also found that petitioner "believed that she 'had a good case'" against ACS for sexual harassment, but that she chose to sign the agreement to avoid litigation, "get the matter over with," and get the payments called for under the Agreement started. The ALJ did not credit petitioner's testimony that she had not read the agreement before signing it (and did not know about the acknowledgments recited in the Agreement), noting her testimony about having negotiated with ACS to change the manner of payment from a lump sum (as specified in the version of the Agreement initially provided to her) to installment payments.

Finally, the ALJ cited the express provision in the Agreement indicating that it was "fully integrated." On that basis, the ALJ ruled that he was "not allowed to consider [petitioner's] testimony or the unfiled emails and other documents [that petitioner said would show that the payments "were settlement for pain and suffering from sexual harassment that she incurred at the hands of her supervisor"] because they are all inadmissible parol evidence offered to alter the plain language of the written agreement." The ALJ reasoned that even if the Agreement were only partially integrated, petitioner's "parol evidence would still be inadmissible

on the issues of the nature of the payments as severance and their allocation because any additional oral terms of the parties' intent would have to be consistent with the terms of the written agreement."  The ALJ stated that petitioner's assertion that the payments were not severance but were in settlement of a claim against ACS "directly contradicts the [A]greement's clear terms" and was "directly contrary to the [Agreement's] terms" that petitioner knew of no claims and had reported none to ACS.[6]

Petitioner attached to her request to change the Final Order what appears to be some of the documentary evidence that the ALJ declined to admit during the hearing.  In denying petitioner's request for a change to the Final Order, the ALJ rejected petitioner's argument that her release of claims against ACS as a condition of receiving the Separation Pay rendered it a settlement rather than severance.  The ALJ reasoned that if petitioner were correct, "then every release of all claims [could] be interpreted on its face to be a settlement of an actual claim for damages and not severance," a result the ALJ rejected as "not true."  This petition for review followed.

---

[6] The ALJ also found that the claims examiner had incorrectly calculated the period of petitioner's ineligibility (erring by not allocating the severance payments according to the Agreement).

In her brief, petitioner raises several points of asserted error. She contends that the ALJ wrongly ignored the underlying facts that gave rise to the Agreement and refused to consider evidence, including both her testimony and her documentary evidence, that would have established that the parties' actual purpose or intent of the Separation Pay—i.e., the actual nature of the payments—was to prevent her from filing suit on her sexual harassment claims and to settle and discharge those specific claims. Petitioner further asserts that the title of the Agreement ("Agreement and General Release") and its release provisions evince that a release of those claims was the purpose of the Agreement, and that the ALJ's conclusion that the payments were severance ignores the fact that petitioner was not entitled to severance under ACS policy (because her most recent performance review had been that she did not meet expectations, an assessment that she asserts was in retaliation for her rejection of her supervisor's unwanted advances). Although acknowledging that the payments were calculated based on her years of service, petitioner contends that this was simply a "gauge" of what would be an acceptable amount and did not render the payments earnings. She also contends that the Agreement is ambiguous, justifying and necessitating consideration of parol evidence. She contends in addition that the ALJ overlooked the Agreement term by which the parties agreed that she retained full rights to claim

unemployment compensation, without which she would not have signed the Agreement.[7]

## II. Applicable Law

This court will affirm an OAH decision "when '(1) OAH made findings of fact on each materially contested issue of fact, (2) substantial evidence supports each finding, and (3) OAH's conclusions flow rationally from its findings of fact.'" *Young v. D.C. Dep't of Emp't Servs.*, 268 A.3d 827, 830 (D.C. 2022) (quoting *Rodriguez v. Filene's Basement Inc.*, 905 A.2d 177, 180 (D.C. 2006)). "We defer to the [OAH] ALJ's factual findings as long as they are supported by substantial evidence." *Lynch v. Masters Sec.*, 93 A.3d 668, 674 (D.C. 2014) (quoting *Badawi v. Hawk One Sec., Inc.*, 21 A.3d 607, 613 (D.C. 2011)). The obligation to rule on

---

[7] We note that Section 2(g) of the Agreement explicitly provides that "ACS will not dispute or attempt to deny Employee unemployment benefits" and that "[n]otwithstanding anything else in this paragraph, ACS will provide truthful information to an unemployment agency." While ACS did not initially participate before OAH, it (a) did file a brief opposing reconsideration of the Final Order determining that petitioner was ineligible for a period in April to June 2023, and (b) subsequently filed a brief in this court acknowledging that it "investigated and could not substantiate" claims that petitioner raised "over a year prior to her termination" and arguing that the court should affirm OAH's ineligibility ruling because the parties unambiguously intended the Separation Pay to be severance. Petitioner has not argued that ACS's filing of those briefs was a breach of the Agreement. In the absence of any such argument, we have considered ACS's brief filed in this court, but we note that our disposition of the case would be the same even if we were to disregard it.

the basis of substantial evidence requires an ALJ "to consider all the evidence" and to "engage with the evidence across the record . . . to get to the bottom of the issue." *Alston v. D.C. Dep't of Emp. Servs*., 314 A.3d 58, 67 (D.C. 2024).

"Our review of [OAH's] legal rulings is *de novo*, for '[i]t is emphatically the province and duty of the judicial department to say what the law is.'" *Harris v. D.C. Office of Worker's Comp.*, 660 A.2d 404, 407 (D.C. 1995) (quoting *Marbury v. Madison*, 5 U.S. (1 Cranch) 137, 177 (1803)). "[W]hether a contract is ambiguous, is a legal question, which this court reviews de novo." *Tillery v. D.C. Contract Appeals Bd.*, 912 A.2d 1169, 1176 (D.C. 2006). If contract language is ambiguous, the finder of fact must look to extrinsic evidence, which "may include the circumstances before and contemporaneous with the making of the contract," to determine "what a reasonable person in the position of the parties would have thought the disputed language meant." *Id.*; *see also Dodek v. CF 16 Corp.*, 537 A.2d 1086, 1092 (D.C. 1988) (the meaning of ambiguous contract language is an issue for the finder of fact). We defer to the OAH ALJ's credibility determinations, recognizing that "only the ALJ heard testimony and observed the demeanor of the witnesses." *Bartholomew v. D.C. Office of Tax & Revenue*, 78 A.3d 309, 320 (D.C. 2013) (quoting *Raphael v. Okyiri*, 740 A.2d 935, 945 (D.C. 1999)).

### III. Analysis

Our resolution of this appeal rests on two overall conclusions: First, the ALJ did not err in reasoning that whether (some or all of) the Separation Pay in issue here was severance pay (or "earnings") rendering petitioner ineligible to receive unemployment benefits between April 5 and June 28, 2023, depends on what the parties intended the payments to be for. Second, under an exception to the parol evidence rule for "untrue recitals," the ALJ erred in declining to consider petitioner's evidence about the facts underlying the Agreement as they bore on what (some or all of) the Separation Pay was for.

### A.

The District of Columbia's unemployment compensation regulations broadly define the term "severance pay" as "a payment in addition to any back wages due made by an employer to an employee whose employment is permanently terminated by the employer." 7 D.C.M.R. § 399. Further, as noted above, the regulations state that "[s]everance pay constitutes earnings[,]" 7 D.C.M.R. § 321.11, that can reduce or render a claimant ineligible for unemployment benefits. *See* D.C. Code § 51-107(e) (earnings reduce weekly unemployment benefits). However, during the hearing in this matter, the ALJ asked the DOES claims examiner whether money paid by an employer to employee (presumably,

upon termination) not for lost wages, but for pain and suffering, would be treated as earnings, and the claims examiner answered, "No."[8]

The foregoing exchange seems to indicate that notwithstanding the very broad definition of "severance pay" in Section 399 of its regulations, DOES agrees that not all payments an employer makes to an employee upon the employee's separation will necessarily be treated as earnings. And, as described above, the ALJ agreed that the parties' intent "governs the nature of post-employment payments." The ALJ appeared to treat the parties' use of the term "severance" as some indication of, but not entirely dispositive with respect to, the parties' intent in that regard. (Recall the ALJ's statement that the parties' "[c]alling [the Separation Pay] severance pay doesn't make it severance pay.")

Our governing statute does not specifically address the issue, but our case law does support the ALJ's understanding that the nature of payments made upon separation of an employee depends on the parties' intent regarding what the payments are for. In *Dyer v. D.C. Unemployment Comp. Bd.*, 392 A.2d 1 (D.C. 1978), we confirmed the ineligibility of a claimant for unemployment benefits during a period if they receive severance payments that are "for that period." *Id.* at 3; *see also Gardner v. District of Columbia Dep't of Emp. Servs.*, 736 A.2d 1012,

---

[8] Similarly, in the Final Order, the ALJ stated, "if the parties intended the payments to reimburse or replace a loss Employer caused Claimant to incur by a past injury or damage, then the payments were not severance."

1017 (D.C. 1999) ("[E]ven though Gardner's termination letter from the District of Columbia did not expressly designate his severance pay for a particular period, Gardner represented to DOES . . . that the severance payment was intended as remuneration for the four-week period immediately following the date of his termination."). Further, in *Maturu v. District of Columbia Dep't of Emp. Servs.*, 722 A.2d 846 (D.C. 1999), we established that how or when a payment was made (e.g., as part of the employer's regular payroll or in a lump sum) must take a backseat to what the payment was intended to cover. *Id.* at 848 ("An issue then arises about the intent of the parties with respect to the time period for which the severance pay was received (that is, was to be attributable)."). We remanded the case for a finding as to the parties' intent. *Id.* at 849.

While the foregoing cases focused on the parties' intent as to what time period payments were for, we accept for purposes of our analysis in this case the ALJ's reasoning that the parties' intent regarding what post-termination payments are for should govern whether they must be treated as earnings. While we need not definitively decide the issue for all time, we can take that approach here because neither ACS nor petitioner has contested the point; because DOES, in electing to "submit[] based on the decisions and orders" of the ALJ, has not objected to the ALJ's reasoning that the nature of the payments here depends on the parties' intent; and because looking to the parties' intent may assist in "accomplish[ing] the

legislative and statutory intent of minimizing the economic burden of unemployment," *Wright-Taylor v. Howard Univ. Hosp.*, 974 A.2d 210, 217 (D.C. 2009) (citing *Thomas v. District of Columbia Dep't of Labor*, 409 A.2d 164, 170-71 (D.C. 1979)).[9]

## B.

We also conclude—agreeing with petitioner—that the ALJ erred in not considering parol evidence as it bears on what the parties' intended the Separation Pay to be for.

As described above, the ALJ relied on the Agreement's express statements that it "sets forth the entire agreement between the Parties" and that "parol evidence shall not be admissible to alter, vary, or supplement the term of th[e] Agreement" to conclude that he was "not allowed to consider [petitioner's] testimony or the unfiled emails and other documents" because they were "inadmissible parol evidence[.]" He also reasoned that petitioner's assertion that

---

[9] *Cf. In re Claim of Gjerdahl*, 411 N.W.2d 283, 286-87 (Minn. Ct. App. 1987) (reversing unemployment agency's determination that claimant was ineligible for unemployment benefits because there was no proof of what portion of post-termination payments made by the employer was specifically intended to cover loss of wages and what portion of structured payment was to compensate the former employee for injuries sustained while he was employed and to settle all potential claims).

the payments were not severance but were in settlement of a claim against ACS "directly contradicts the [A]greement's clear terms" and was "directly contrary to the [Agreement's] terms" that petitioner knew of no claims and had reported none to ACS. And he reasoned that the Agreement's "clear and definite language shows that the payments were not reimbursement for any claim [petitioner] had against Employer for sex discrimination or sexual harassment," since petitioner agreed by signing the Agreement that she had "no knowledge of any existing violations . . . of law[]." The ALJ reasoned that if petitioner knew of no claim against ACS, the Agreement "could not be a settlement for such a claim."

What the ALJ overlooked is that the parol evidence rule establishes only that "extrinsic or parol evidence which tends to contradict, vary, add to, or subtract from the terms of a written contract must be excluded." *Segal Wholesale, Inc. v. United Drug Serv.*, 933 A.2d 780, 783 (D.C. 2007) (internal quotation marks omitted). "[T]he parol evidence rule does *not* prevent a party to a contract from presenting evidence that 'a recital of fact in an integrated agreement may be . . . untrue.'" *Nova Grp./Tutor-Saliba v. United States*, 87 F.4th 1375, 1380 (Fed. Cir. 2023) (emphasis added) (quoting *United Pac. Ins. Co. v. Roche*, 401 F.3d 1362, 1365 (Fed. Cir. 2005) (citing Restatement 2d of Contracts, § 218 ("Untrue Recitals") ("A recital of a fact in an integrated agreement may be shown to be untrue."))); *Fulton v. L&N Consultants, Inc.*, 715 F.2d 1413, 1419 n.7 (10th

Cir. 1982) (noting that comment b to Section 218 states that facts contrary to "[a]

recital of fact in an integrated agreement . . . may be proved" and "[t]he result may

be that the integrated agreement . . . has a different effect from the effect if the

recital had been true").[10]   Although we have not cited to Section 218 in our

_____

[10] *See also, e.g., Birdsell v. Fort McDowell Sand & Gravel (In re Sanner)*, 218 B.R. 941, 945 (Bankr. D. Ariz. 1998) ("A recital of a fact in an integrated agreement may be shown to be untrue."); *Henry v. Green*, No. 26286-3-III, 2008 Wash. App. LEXIS 351, *8 (Wash. Ct. App. 2008, Feb. 14, 2008) ("A party to a contract is not bound by a false recital of fact, and parol evidence is admissible to show the true state of affairs.") (quoting *Black v. Evergreen Land Devs., Inc.*, 450 P.2d 470, 476 (Wash. 1969) (quoting *Cook v. Vennigerholz*, 269 P.2d 824, 827 (Wash. 1954))); *Terwilliger v. York Int'l Corp.*, No. 94-1662 et al., 1995 U.S. App. LEXIS 14786, *5-7 (4th Cir. 1995) ("The modern and now almost uniform rule is that the recital in a deed of the receipt of consideration does not preclude parol evidence of its nonpayment.") (quoting *Burke v. Sweeley*, 12 S.E.2d 763, 765 (Va. 1941)); *McCandless v. Carpenter*, 848 P.2d 444, 447 (Idaho Ct. App. 1993) ("The law uniformly allows the admission of parol evidence to prove that a recital of fact is untrue.") (quoting *Vanoski v. Thomson*, 757 P.2d 244, 246 (Idaho Ct. App.1988) (stating that the recital in a deed that was "merely a receipt or acknowledgement of payment" was "susceptible to explanation or contradiction by parol evidence" and holding that the trial court did not err "in admitting parol evidence to contradict the untrue recitals of fact in the deed")); *Shoreham Devs., Inc. v. Randolph Hills, Inc.*, 235 A.2d 735, 739 (Md. 1967) ("[E]ven the sentence 'This contract contains the final and entire Agreement between the parties,' may embody a recital of facts which may be untrue.  Such an integration clause is not invariably conclusive, and its coverage is a matter of interpretation."); *Fullmer v. Morrill*, 273 P.2d 885, 887 (Utah 1954) ("Parol evidence is admissible to contradict a false recital of fact, the parol evidence rule applying only to the *terms* of the contract."); *Richeson v. Wood*, 163 S.E. 339, 343 (Va. 1932) ("Where the consideration for a written contract is mentioned therein merely by way of recital and is not a contractual term of the contract, the general rule is that the true consideration for the contract may be shown by either party by extrinsic evidence, although it is different from that expressed. This is a well recognized exception to the parol evidence rule.").

jurisprudence, our jurisdiction has embraced the principle it articulates. *See Allen v. Allen*, 133 A.2d 116, 118 (D.C. 1957) (stating that "[r]ecital of consideration in an unsealed instrument may be contradicted by parol evidence" that no payment was actually made).[11]

Petitioner testified during the hearing before the ALJ that her acknowledgment in the Agreement that she had not reported to ACS any allegation of wrongdoing by ACS or its officers was "absolutely incorrect." In turn, the ALJ stated during the hearing that he did not see "any reason why [he] should disbelieve what [petitioner was] telling [him]" regarding communications she had with ACS about her alleged sexual harassment and hostile work environment claim. Despite that assessment (which we take as a credibility determination to which we owe deference), the ALJ—citing petitioner's recitals[12] in the Agreement

---

[11] This is notwithstanding that, regarding the *terms* of contracts, we "adhere[] to the 'objective law' of contracts," under which "the contracting parties' unexpressed intent at the time the contract was entered into is irrelevant if the contractual terms are otherwise unambiguous, or unless there is fraud, duress, or mutual mistake," and which obliges us to "follow the parol evidence rule, which excludes extrinsic evidence to assist in contract interpretation and limits our analysis to the plain meaning of the contractual terms if they are otherwise unambiguous." *2301 M St. Coop. Ass'n v. Chromium LLC*, 209 A.3d 82, 86-87 (D.C. 2019) (internal quotation marks omitted).

[12] "[R]ecitals are 'explanations of the circumstances surrounding the execution of the contract.'" *Nova Grp./Tutor-Saliba*, 87 F.4th at 1380 (quoting 17A C.J.S. Contracts § 420). "Contracts often contain recitals: provisions that do

that she knew of no violations of law by ACS and reported none, and also citing the parol evidence rule—declined to consider petitioner's testimony that the actual purpose and intent of the Agreement and reason for entering into it were to prevent her from filing suit on her sexual harassment claims and the parties' agreement to settle and discharge those claims. That was error because, as the cases cited above establish, the parol evidence rule did not preclude the ALJ as the finder of fact from considering extrinsic evidence bearing on the truth of the factual recitals in the parties' Agreement as he undertook to ascertain the parties' intent regarding what (some or all of) the Separation Pay was for. *Cf. Nova Grp./Tutor-Saliba*, 87 F.4th at 1380 (explaining that parol evidence was admissible where evidence in question was not introduced to modify any term of the parties' contract but to support the government's "collateral contentions as to why it settled"); *Fistere, Inc. v. Helz*, 226 A.2d 578, 580 (D.C. 1967) (holding that the trial court did not err in admitting parol evidence "which tended not to contradict or vary the instrument but to explain it"). Here, notably, petitioner has not sought to rescind or narrow the release to which she agreed, to obtain additional compensation from ACS, to avoid any obligations to which she agreed under the terms of the Agreement, or to

---

not make binding promises but merely recite background information about factual context or the parties' intentions . . . [and] [w]hile such recitals are often set forth at the beginning of the agreement in 'whereas' clauses, that is not always the case." *Sprint Nextel Corp. v. Wireless Buybacks Holdings, LLC*, 938 F.3d 113, 127 (4th Cir. 2019).

vary any *terms* of the Agreement. Rather, she sought only to show that certain factual recitals set forth in the Agreement, bearing on whether some or all of the Separation Pay represented a settlement rather than severance-payment earnings, were untrue.

The parol evidence rule did not preclude the ALJ from considering petitioner's explanation that contravened the factual recitals (labeled "Acknowledgments"), because the recitals did "not themselves create promises, obligations, or substantive rights" and therefore "are not operative terms that are protected against alteration by the parol evidence rule." *Nova Grp./Tutor-Saliba*, 87 F.4th at 1380. Petitioner's evidence that the recitals were untrue had the potential to give the Agreement "a different effect from the effect if the recital had been true," Restatement 2d of Contracts, § 218, comment b, such as persuading the finder of fact that some of all of the Separation Pay it called for was intended as a settlement rather than additional earnings.[13] Thus, we cannot say that the ALJ's

---

[13] We are not persuaded by petitioner's argument that the title of the Agreement ("Agreement and General Release") and its inclusion of a "General Release of All Claims" definitively show that the Separation Pay was in settlement of petitioner's sexual harassment and discrimination claims. Courts have observed that "general releases are in common use" and are "intended to cover everything— what the parties presently have in mind, as well as what they do not have in mind." *Menna v. Weidhaas*, No. 2022-0509-MTZ, 2023 Del. Ch. LEXIS 215, *17 n.75 (Del Ch. Jul. 28, 2023).

erroneous application of the parol evidence rule was harmless.  We conclude that a remand is required for the ALJ to consider petitioner's testimony (and any admitted hearing exhibits) that were contrary to the factual recitals in the Agreement.  We also conclude that the Agreement is ambiguous as to how much, if any, of the Separation Pay constituted what the ALJ called "traditional severance" (in the sense of a replacement for lost wages) rather than compensation in settlement of injury claims.  *See supra* note 5.  For that reason, too, a remand is required for the ALJ to receive evidence that bears on the meaning of the Agreement's statement that the benefits under the Agreement "includ[e] severance pay" and its reference to "the amount paid as severance."

We recognize that petitioner sought to present some of the underlying facts pertinent to the parties' reasons for entering into the Agreement through exhibits that she did not submit until the day of the hearing, in contravention of the ALJ's

---

The issue as petitioner has presented it is whether ACS had her sexual harassment claims "in mind" and paid to compensate her for her claimed injury and to obtain a release of her claims.  We need not and do not decide more generally whether the ALJ was correct in stating (with a citation to *Maturu*) that "severance can include payments for confidentiality and [general] releases of claims . . . ."  In *Maturu*, the claimant "was required to waive all claims that she might have against the employer" as a condition of receiving the payments made to her upon his dismissal from employment.  *See* 722 A.2d at 847.  In remanding the case for resolution of the "intent of the parties with respect to the time period for which the severance pay was received," *id.* at 848, 849, we may have implied that the payments were properly treated as severance, but that was not a holding of the case.

order requiring that exhibits be submitted in advance of the hearing. We leave it to the discretion of the ALJ as to whether, on remand, to consider the previously excluded exhibits.

## IV. Conclusion

For the foregoing reasons, we reverse the decisions of OAH and remand for further proceedings as indicated herein.

*So ordered.*